# EXHIBIT B

SALES AND DISTRIBUTION AGREEMENT

THIS AGREEMENT is entered into this 11th date of November, 2009 (the "Effective Date"), by and between Elkay Manufacturing Company, a Delaware corporation (the "Supplier") and Global Tap, LLC, a limited liability company (the "Distributor").

W I T N E S E T H:

WHEREAS, Distributor has designed an outdoor water bottle filling station with the ornamental design as depicted on the product design attached hereto as Exhibit A (the "Product Design");

WHEREAS, Supplier has taken the Product Design and engineered an outdoor water bottle filling station meeting the specifications set forth in Exhibit B attached hereto (the "Product Engineering");

WHEREAS, Distributor and Supplier desire to enter into a relationship whereby Supplier will manufacture outdoor water bottle filling stations utilizing Distributor's Product Design and Supplier's Product Engineering (the "Products") for distribution and sale by Distributor and Supplier as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein and intending to be legally bound, the parties hereby agree as follows.

ARTICLE I

MANUFACTURE OF PRODUCTS

Section 1.1. During the Term of this Agreement, Distributor hereby grants Supplier an exclusive license to utilize the Product Design in connection with the manufacture of the Products.

Section 1.2. During the Term of this Agreement, Supplier agrees to manufacture and sell to Distributor, and Distributor agrees to purchase from Supplier, Products for resale to Distributor's customers. During the Term, Supplier shall be the exclusive licensee of the Product Design and the exclusive supplier of the Products and Distributor shall not provide the Product Design to any other supplier. Likewise, Supplier agrees that it will not utilize the Product Design in the manufacture of any products other than those sold to Distributor hereunder and those sold directly by Supplier pursuant to Article III. Distributor acknowledges that Supplier is in the business of the development, design, manufacture, distribution and sale of water fountains and water coolers, including outdoor fountains and bottle filling products and nothing herein shall preclude Supplier from developing, designing, manufacturing, distributing or selling any products, except as expressly set forth herein.

Section 1.3. Supplier will be responsible for obtaining, at its sole cost and expense, all tooling necessary for the manufacture of the Product, which tooling will be the sole property of Supplier.

Section 1.4. Supplier will extend to Distributor and its customers all standard Supplier warranties that apply to the Product sold to Distributor under the terms of this Agreement. Supplier shall not be responsible for any other representations or warranties made by Distributor with respect to Product quality, capacity, performance, and related matters.

Section 1.5. All servicing and repair of Products shall be performed by Supplier authorized service agents during the warranty period.

ARTICLE II

TERMS OF SALE OF PRODUCT

Section 2.1. Distributor shall order such Product as it shall desire from Supplier pursuant to such reasonable procedures as Supplier shall periodically specify.

a. Distributor is to provide Supplier quarterly sales forecasts for production planning purposes

b. Production lead times:

| Units | Weeks |
|---|---|
| 1-9 | 2-4 |
| 10-24 | 4-6 |
| 25+ | Check with factory |

Section 2.2. The Purchase Price of Products shall be $1,747.50 per unit. Pricing shall be reviewed on an annual basis and will have a 5% max increase per year. The price is FOB Supplier's Savanna, Illinois production facility. All brokerage, freight and other fees are the responsibility of Distributor. Distributor shall be solely responsible for the prices it charges its customers for the Product.

Section 2.3. Distributor shall pay all Supplier invoices no later than thirty (30) days from the respective date of shipment of the Product in question. All Supplier invoices shall be paid in full without any deductions or credits of any kind, except for deductions related to defective Product. Any requests for credit or deduction by Distributor (e.g., due to shortage in shipment quantity, quality defects, damaged in transit or related matters) shall be processed in the form of a separate invoice to Supplier.

.

ARTICLE III

SALES BY SUPPLIER

Section 3.1.    The Supplier shall have the right to sell Products through its own sales distribution network provided that it pays Distributor a license fee for each Product sold directly by Supplier and provided that it shall not sell Products through direct sales to municipalities. The license fee shall be at the rate of $100.00 per unit for the first 250 units sold, $125.00 per unit for the second 250 units sold, and $175.00 per unit for units sold in excess of 500. Distributor shall not be paid a license fee on returned Products, uncollectible accounts or Products sold to Distributor hereunder.  License fees shall be paid on a quarterly basis and shall be accompanied by License Fee Reports which include, at a minimum, a statement of the total number of Products sold by Supplier other than to Distributor for the quarterly period, a list of uncollectible accounts and returns from prior shipments, and a statement of the amount of license fees accrued for the applicable period.

ARTICLE IV

TRADEMARKS

Section 4.    The parties agree that the Products will be sold on a co-branded basis, using both the "Global Tap" mark and the "Elkay" [or "Halsey Taylor"] registered trademarks and each party grants the other, during the Term of this Agreement, a non-exclusive right to use the other parties Trademarks solely in connection with the manufacture, distribution and sale of Products hereunder.  Upon termination or expiration of this Agreement, each party shall discontinue use of the other party's Trademarks

ARTICLE V

WARRANTIES AND REPRESENTATIONS

INDEMNIFICATION

Section 5.1.    Supplier warrants that:

    a.    It will take responsibility for all customer warranty claims properly

      honored by Distributor under the terms of Supplier's standard warranties;

  b.  It is the sole and exclusive owner of the Product Engineering;

  c.  Use of any Supplier owned Trademark does not infringe any rights of Third Parties; and

  d.  It has the right and authority to enter into this Agreement.

Section 5.2  Distributor warrants that:

  a.  It has the power and authority to enter into this Agreement;

  b.  It will advise Supplier of any claim for damages or breach of warranty in respect to the Product asserted by a customer purchasing such Product from Distributor and shall cooperate with Supplier in the defense or handling of such claims;

  c.  It will promptly furnish Supplier with product samples and any related information when a warranty claim is made by a customer; and

  d.  It is the sole and exclusive owner of the Product Design; and

  e.  Use of any Distributor owned Trademark does not infringe any rights of Third Parties;

Section 5.3.  Supplier shall save, hold harmless, and defend Distributor from and against any loss, cost, or expense, including reasonable attorneys' fees, damages, or penalties of any kind on account of or resulting from any claim or action arising from the breach by Supplier of any of its warranties or obligations set forth herein. Supplier shall defend any such claim or action at its own expense provided that Distributor promptly notifies Supplier on learning of any such claim or action and cooperates with Supplier in defending any such claim or action.

Section 5.4.  Distributor shall save, hold harmless, and defend Supplier from and against any loss, cost, or expense, including reasonable attorneys' fees, damages, or penalties of any kind on account of or resulting from any claim or action arising from the breach by Distributor of any of its warranties or obligations set forth herein. Distributor shall defend any such claim or action at its own expense provided that Supplier promptly notifies Distributor on learning of any such claim or action and cooperates with Distributor in defending any such claim or action.

## ARTICLE VI

## CONFIDENTIALITY

During the Term of this Agreement, and for a period of three years from the date of expiration or termination of this Agreement, each party (the "Receiving Party") shall treat all confidential information it receives from the other party ("Disclosing Party") as secret and proprietary and shall not disclose or use such information except as provided in this Agreement. The Receiving Party shall develop and implement such procedures as may be reasonably required to prevent the intentional or negligent disclosure to third parties of confidential information communicated to Receiving Party and its employees by Disclosing Party.

Nothing in this Agreement shall prevent the disclosure by Receiving party or its employees of confidential information that:

- a. Prior to the transmittal thereof to Receiving Party was of general public knowledge;

- b. Becomes, subsequent to the time of transmittal to Receiving Party, a matter of general public knowledge otherwise than as a consequence of a breach by Receiving Party of any obligation under this Agreement;

- c. Was in the possession of Receiving Party in documentary form prior to the time of disclosure thereof to Receiving Party by Disclosing Party, and is held by Receiving Party free of any obligation of confidence to Disclosing Party or any third party;

- d. Is received in good faith from a Third Party having the right to disclose it, who, to the best of Receiving Party's knowledge, did not obtain such information from Disclosing Party and who imposes no obligation of secrecy on Receiving Party with respect to such information; or

- e. Is independently developed by the Receiving Party without reference to the Disclosing Party's information.

## ARTICLE VII

## TERM AND TERMINATION

Section 7.1. This Agreement shall remain in effect for a period of three (3) years from the Effective Date (the "Term").

Section 7.2. Either party shall have the right to terminate this Agreement at any time, by giving written notice to the other party on the occurrence of any of the following events:

a. Failure or neglect of a party to perform covenants or provisions of this Agreement if such default is not corrected within thirty (30) days after receiving written notice from the other party with respect to such default; or

b. Any act, determination, filing, judgment, declaration, notice, appointment of receiver or trustee, failure to pay debts, or other events under any law applicable to a party indicating the insolvency or bankruptcy of such party.

Section 7.3. On termination of this Agreement:

a. Supplier shall have no right to utilize the Product Design for the manufacture of Product;

b. Distributor shall have no right to the product tooling or to and drawings or specifications regarding the Product;

c. The parties shall discontinue use of the other's Trademarks; and

d. Each party shall have the right to sell off all existing Product.

Notwithstanding anything herein to the contrary, Article V shall survive termination of this Agreement for a period of three years.

ARTICLE VIII

RIGHT OF FIRST REFUSAL

Section 8.1.  The parties contemplate that Distributor will work with Supplier with respect to the engineering and manufacture of new outdoor water bottle filling station products contemplated by Distributor and based on the Products.  In advance of beginning collaborative work on any new products, the parties shall mutually agree on ownership of the intellectual property associated with the new product.  In addition, during the Term of this Agreement, and for a two year period after termination or expiration, Supplier shall have the right of first refusal to manufacture any outdoor water bottle filling station product developed by Distributor either alone, with Supplier or with a third party (parties) on substantially the same terms and conditions as offered by a third party manufacturer.

ARTICLE IX

MISCELLANEOUS

Section 9.1.    Assignment.  This Agreement shall not be assignable by either party without the written consent of the other, which consent shall not be unreasonably withheld.

Section 9.2.    Amendment.  No change, modification, or amendment of this Agreement shall be valid or binding on the parties unless such change or modification shall be in writing signed by the party or parties against whom the same is sought to be enforced.

Section 9.3.    Remedies Cumulative.  The remedies of the parties under this Agreement are cumulative and shall not exclude any other remedies to which the party may be lawfully entitled.

Section 9.4    Applicable Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois in the United States.

Section 9.5.    Costs and Expenses.  Unless otherwise provided in this Agreement, each party shall bear all fees and expenses incurred in performing its obligations under this Agreement.

Section 9.6.     Integration.  This Agreement constitutes the full and complete agreement of the parties with respect to the subject matter contained herein.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the date first written above by their authorized officers.

ELKAY MANUFACTURING COMPANY.

_____

By: Jack Krecek, VP & General Manager

Commercial Business Unit


GLOBAL TAP, LLC

_____

By: Daniel H. Whitman, President

# Exhibit A – Product Design






Concept     Design     First Shot Prototype

# Exhibit B – Product Engineering