**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GLOBALTAP LLC** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 13 C 632** |
| | ) | |
| | ) | **Judge Rebecca R. Pallmeyer** |
| **ELKAY MANUFACTURING COMPANY** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff GlobalTap, LLC developed a concept and design for outdoor water bottle-filling stations and contracted with Defendant Elkay Manufacturing Company to manufacture and distribute these bottle-filling stations. Elkay later refused to manufacture an order of GlobalTap's bottle fillers and eventually launched its own line. On January 25, 2013, GlobalTap filed this action, alleging that in bringing its own product to market, Elkay misappropriated GlobalTap's trade secrets and breached two contracts. GlobalTap maintains that, as a result of Elkay's conduct, GlobalTap lost a valuable opportunity to be the first to market the stations. Elkay moves for summary judgment [88], asserting that GlobalTap has failed to present sufficient evidence to support its claims. For the reasons below, Elkay's motion is granted in part and denied in part.

## BACKGROUND

In February 2009, Daniel Whitman, the founder and CEO of GlobalTap, approached Rod Magnuson, a Product Director at Elkay, to discuss plans for manufacturing the outdoor bottle-filling stations GlobalTap had developed. (*See* GlobalTap's Ans. to Elkay Mfg. Co.'s Local R. 56.1 Statement of Undisputed Material Facts [96-1], hereinafter "GT Ans. to Elkay's SOF," ¶ 4; Decl. of Thomas J. Nitschke in Supp. of GlobalTap LLC's Resp. [96-3], hereinafter "Nitschke Decl.," Dep. of Rod Magnuson, Ex. A to Nitschke Decl., hereinafter "Magnuson Dep.," 6:9–20.)

On February 27, 2009, the parties entered into a Confidential Disclosure Agreement ("CDA") in order to "explore their mutual interests in [GlobalTap]'s project concerning distribution of municipal water."  (GlobalTap, LLC's Local R. 56.1(b)(c)(3)(C) Statement of Additional Facts in Opp. to Def.'s Mot. for Summ. J. [96-2], hereinafter "GT's SOF," ¶ 1; Confidential Disclosure Agreement, Ex. J to Nitschke Decl., hereinafter "CDA.")  In the CDA, Elkay agreed that any information it received from GlobalTap would be "held in confidence," that Elkay would take "such steps as may be reasonably necessary to prevent the disclosure of INFORMATION to others," and that Elkay would "not utilize the INFORMATION beyond the PURPOSE without first having obtained the written consent of" GlobalTap.  (CDA § 2.)

Negotiations were successful.  On November 11, 2009, the parties formalized their relationship in a Sales and Distribution Agreement ("SDA").  (GT's SOF ¶ 2.)  Under the terms of the SDA, Elkay agreed to "manufacture and sell to [GlobalTap] . . . Products for resale to [GlobalTap's] customers."  (Decl. of Vincent M. Smolczynski in Supp. of Elkay's Mot. for Summ. J. [92], hereinafter "Smolczynski Decl.," Sales and Distribution Agreement, Ex. F to Smolczynski Decl., hereinafter "SDA," § 1.2.)  "Products" are defined as outdoor bottle-filling stations with the "Product Design" referenced in Exhibit A to the SDA, which shows three images of GlobalTap's "cane" design, a free-standing base with one long arm bent in a shape that roughly resembles a candy-cane, ending in a spout that can be used to fill a water bottle held vertically.  (SDA at 1; Ex. A – Product Design to SDA; *see* Appendix A.)  Under the SDA, GlobalTap had the right to "order such Product as it shall desire from [Elkay] pursuant to such reasonable procedures as [Elkay] shall periodically specify."  (SDA § 2.1.)  The parties agreed on a schedule for "production lead times," ranging from two to four weeks for orders of one to nine bottle-filling units and four to six weeks for orders of 10 to 24 units.  (SDA § 2.1.)  For orders larger than 25 units, GlobalTap was directed to "check with factory" to obtain the production lead times.  (SDA § 2.1.)  Elkay agreed that it would "be responsible for obtaining, at its sole cost and expense, all

tooling[1] necessary for the manufacture of the Product."  (SDA § 1.3.)

Elkay again committed to keeping certain information confidential.  Specifically, the SDA prohibited Elkay from "disclos[ing] or us[ing] such information except as provided in this Agreement."  (SDA at Art. VI.)  The SDA's confidentiality provision exempts information that "prior to" or "subsequent to the time of transmittal," becomes "a matter of general public knowledge," as well as information that "was in the possession of [Elkay] in documentary form prior to the time" GlobalTap conveyed the information to Elkay.  (SDA at Art. VI.)  Elkay further agreed that it would "not utilize the Product Design in the manufacture of any products other than those sold to [GlobalTap] . . . and those sold directly by [Elkay] pursuant to Article III."[2] (SDA § 1.2.)  Elkay also maintained a "right of first refusal to manufacture any outdoor water bottle filling station product developed by [GlobalTap] either alone, with [Elkay,] or with a third party."  (SDA § 8.1.)  Though Elkay's rights to use the Product Design were limited, Elkay was not restricted from manufacturing bottle-filling products generally.  Thus, GlobalTap acknowledged

> that [Elkay] is in the business of the development, design, manufacture, distribution and sale of water fountains and water coolers, including outdoor fountains and bottle filling products and that nothing herein shall preclude [Elkay] from developing, designing, manufacturing, distributing, or selling any products, except as expressly set forth herein.

(SDA § 1.2.)  Finally, each party maintained "the right to terminate this Agreement at any time, by giving written notice to the other party," in the event that the other party failed to perform and

---

[1]     The parties do not define the term "tooling" in their Local Rule 56 statements.  The court understands "tooling" to be the process of setting up equipment to manufacture large numbers of a product.  Defendant's reply brief describes it as follows: "tooling requires the entire manufacturing process, much like an assembly line, in order to maximize efficiencies when a high quantity of units are needed."  (Elkay Mfg. Co.'s Reply in Supp. of Its Mot. for Summ. J. [100], hereinafter "Elkay's Reply," 10.)  The court notes, however, that Elkay cites to a portion of Mr. Magnuson's testimony that was not provided to the court.

[2]     Article III gave Elkay "the right to sell Products through its own sales distribution network provided that it pays [GlobalTap] a license fee for each Product sold directly by [Elkay] and provided that it shall not sell Products through direct sales to municipalities."  (SDA § 3.1.)

"such default is not corrected within thirty (30) days after receiving such written notice." (SDA § 7.2.a.)

In December of 2009, shortly after the signing of the SDA, GlobalTap partnered with[3] the City of San Francisco, to install a single Elkay-manufactured prototype of GlobalTap's outdoor bottle-filling station. (GT's Ans. to Elkay's SOF ¶ 27.) According to Whitman, this "pilot launch" was intended to test the product and generate publicity and interest in GlobalTap's bottle-filling stations. (Discovery Dep. of Mr. Whitman Pt. 1, Ex. E to Nitschke Decl., hereinafter "Whitman Discovery Dep. Pt.1," 79:6–9; Discovery Dep. of Mr. Whitman Pt. 1, Ex. B to Smolczynski Decl. at 89:1–8.) Sometime in 2010, Elkay completed development of its own line of outdoor bottle-filling stations, and began selling those stations in 2011. (GT's Ans. to Elkay's SOF ¶ 4.) Elkay's line of outdoor bottle fillers has the same functionality as GlobalTap's bottle-filling stations—specifically the ability to fill a vertically-held water bottle—but Elkay's model differs in two ways: First, Elkay's model allows customers to adapt Elkay's existing, traditional outdoor fountains with the new bottle-filling mechanism. (*See* Aug. 6, 2010 E-mail, Ex. D to Nitschke Decl.) Second, Elkay's design is cylindrical, while GlobalTap's cane design includes a long arm. (*Compare* Appendix A *with* Appendix B.)

The parties dispute how and when Elkay came up with the concept for its line of outdoor bottle-filling stations. GlobalTap alleges that Elkay began developing the product after it heard Whitman present GlobalTap's concept and business plan in February of 2009. (GT's SOF ¶ 1.) Elkay claims that one of its employees, Jonathan Chong, only began developing an outdoor bottle-filling station in 2010. (Elkay Mfg. Co.'s Statement of Undisputed Material Facts in Supp. of Its Mot. for Summ. J. [88-1], hereinafter "Elkay's SOF," ¶ 5; Dep. of Jonathan Chong, Ex. C to Nitschke Decl., hereinafter "Chong Dep.," 5:18–6:8.) According to Elkay, Mr. Chong did not

---

[3]     The Amended Complaint references a contract with the City of San Francisco, (*see* Am. Compl. [1], ¶ 27), but neither party has provided a copy to the court, described its terms, or made any other reference to a contract.

have access to GlobalTap's confidential information: Mr. Chong testified that Franco Savoni, a Senior Product Manager, directed him to base the design on Elkay's existing, traditional outdoor drinking fountains. (Elkay's SOF ¶ 5; Chong Dep. at 6:4–8, 9:17–10:1.) Any GlobalTap information Mr. Chong used, Elkay continues, must have been public information because Mr. Chong obtained it through searching for images on Google. (Elkay's SOF ¶ 5; Chong Dep., 30:13–31:20.) GlobalTap notes, however, that on August 2, 2010, Mr. Chong sent an e-mail to Damon Shaw, another engineer at Elkay, requesting that Shaw send him the "3D CAD model from the GLOBAL tap outdoor bottle filler"—a message that, according to GlobalTap, suggests that Mr. Chong had some knowledge of GlobalTap's design features and utilized GlobalTap information that was not publicly available. (Chong Dep. at 32:11–33:1.) GlobalTap has not asserted that the nozzle and drain components are trade secrets themselves, but contends that Mr. Chong's request is evidence that Mr. Chong had access to and used GlobalTap's information when designing Elkay's line of bottle fillers. Elkay responds that the request for these components is insignificant because the model Mr. Chong requested was actually designed by Elkay. (*See* Elkay Mfg. Co.'s Reply in Supp. of Its Mot. for Summ. J. [100], hereinafter "Elkay's Reply," 3.) According to Mr. Chong, he only knew to ask for that particular model because, after Mr. Chong presented his design at a meeting, another Elkay engineer suggested that, rather than re-design a nozzle for the Elkay model, Mr. Chong should look at the nozzle and drain that Elkay had designed for GlobalTap's model. (*See* Elkay's Reply at 3; Chong Dep. at 33:13–34:1.) Elkay has not explained who these other engineers were or how much interaction Mr. Chong had with them when designing Elkay's outdoor bottle-filling stations.

After the December 2009 pilot of GlobalTap's outdoor bottle filler, the relationship between Elkay and GlobalTap rapidly deteriorated. Daniel Whitman was in discussions with individuals from the City of San Francisco (GlobalTap has not identified them) to launch another

fifteen GlobalTap bottle-filling stations in public locations throughout the city.[4] (*See* GlobalTap's Ans. to Elkay's First Set of Interrogatories, Ex. I to Smolczynski Decl., ¶ 16; Whitman Discovery Dep. Pt.1 at 171:16–72:12.) According to Elkay, during these discussions Mr. Whitman made assurances to the City of San Francisco that GlobalTap could provide additional models of bottle fillers that were not referenced in the SDA—including wall-mounted bottle fillers and free-standing combination units that incorporate both bottle fillers and "bubblers" (typical drinking fountains). (Elkay's Reply at 8.) By April of 2010, Mr. Whitman had asked Rod Magnuson at Elkay whether Elkay could produce these additional models.[5] (*See* April 27, 2010 E-mail from Rod Magnuson to Daniel Whitman, Ex. D to Nitschke Decl.) In response to Mr. Whitman's inquiry, Mr. Magnuson explained that Elkay would not produce a GlobalTap wall-unit because it was too similar to Elkay's existing in-wall product, and that Elkay would manufacture GlobalTap's combination units, but only if Mr. Whitman obtained a 30-unit minimum order. (*Id.*) Mr. Whitman nonetheless made promises to San Francisco that by the fall of 2010, GlobalTap would provide the City with 15 bottle fillers, including 8 wall units, 3 combination units, and 5 cane units. (Aug. 10 Mem. from Magnuson to Whitman, Ex. M. to Nitschke Dep., hereinafter "Aug. 10 Mem.," 1.)[6] As Rod Magnuson explained to Mr. Whitman in an August 2010 memo, Elkay interpreted Mr. Whitman's actions as commitments to "sell[] production quality units when

---

[4]     Again, the record is light on the details. The Amended Complaint references a contract between GlobalTap and the City of San Francisco (*see* Am. Compl. [1], ¶ 27), but the contract has not been produced. The court does not know, for instance, how much, if anything, the City was planning to pay for the bottle fillers or whether any public locations had been identified.

[5]     Neither party included complete copies of Mr. Whitman's portions of these e-mail exchanges. The court, therefore, does not have a comprehensive understanding of Mr. Whitman's position during these discussions.

[6]     It appears that substantial portions of the discussions between Mr. Magnuson and Mr. Whitman took place on the phone. (*See* Aug. 6 2010 8:58 AM e-mail from Whitman to Magnuson, Ex. D. to Nitschke Decl.) ("Give me a call today to follow up on yesterdays [sic] call.") The August 10, 2010 Memo from Magnuson to Whitman provides some relevant background regarding the parties' negotiations.

they are either still in a prototype state or do not even exist at all." (*Id.*; *see also* Elkay's Reply at 8.)

Rather than expend resources to develop the new models of GlobalTap's bottle filler, Elkay offered an alternative solution: Franco Savoni, one of Elkay's Senior Product Managers, sent an e-mail to Mr. Whitman on August 6, 2010 explaining that Elkay was "not in a position to expand the Global Tap [sic] product line" beyond the cane design, but Elkay was "in the process of developing a modular outdoor bottle filling unit that would fit onto our existing outdoor fountains," which would be ready in six months. (Aug. 6, 2010 E-mail, Ex. D to Nitschke Decl.) Elkay offered to "create separate branding for Global Tap [sic] on this series of units for your distribution," and, because the Elkay line would not be fully developed by the fall of 2010, Savoni offered to provide prototypes of Elkay's modular line to supply the 15 units San Francisco had requested. (Aug. 6, 2010 E-mail.) Mr. Whitman replied that his contacts within the City of San Francisco insisted upon GlobalTap's wall-unit; Whitman requested that Elkay promptly begin manufacturing the fifteen GlobalTap units. (*See* Aug. 7, 2010 E-mail, Ex. D to Nitschke Decl.) If Elkay could not produce the units in time, Mr. Whitman warned, "I will unfortunately have to find another alternative to protect GLOBALTAP's reputation." (*Id.*)

Three days later, Mr. Magnuson wrote a memo notifying Mr. Whitman that Elkay had "a number of issues with" producing the fifteen units for San Francisco. (*See* Aug. 10 Mem. at 1.) First, he explained, the cane unit "is still in a prototype state," and Elkay did not want to "put any more prototype units in the field." (*Id.*) Second, the three combination units San Francisco requested fell well below the 30-unit minimum Elkay had requested, and finally, he noted that Elkay had consistently refused to produce the GlobalTap wall-unit. (*Id.*) Mr. Magnuson continued, "We understand that you [GlobalTap] may choose to go with another manufacturer with which to satisfy this potential order. If you do so, we will consider the Sales and Distribution Agreement . . . terminated." (*Id.*)

GlobalTap interprets this chain of events as evidence that Elkay never intended to honor

the terms of the SDA because, sometime before signing the agreement, Elkay had developed a plan to launch its own line of outdoor bottle-filling stations. (GT's SOF ¶ 4.) GlobalTap characterizes Elkay's minimum unit requirements for the combination units as a unilateral attempt to change the terms of the SDA and make it a "moving target that GlobalTap could never meet." (GT's SOF ¶ 5.) GlobalTap also points to Elkay's refusal to produce GlobalTap's wall-mounted and combination units, arguing that Elkay breached the SDA when Elkay sought to distribute its own combination and wall units in lieu of GlobalTap's units. (GT's SOF ¶¶ 5–6.)

GlobalTap maintains that Elkay breached the agreement when it refused to set up tooling for the cane design and subsequently refused to produce the cane design altogether. On April 27, 2010, Rod Magnuson, one of Elkay's Product Directors, explained in an e-mail to Mr. Whitman that:

> I cannot see us going into tooling for the cane without at least 100 units on order and another 100 units in backlog . . . it really does not make sense for us to tool anything without knowing that there is a base level of business with which to achieve a return.

(Apr. 27, 2010 9:39 AM E-mail, Ex. D to Nitschke Decl.) Later that day, in response to Mr. Whitman's comments (which are not in the record), Mr. Magnuson clarified that "we can build units without tooling, it just costs more." (Apr. 27, 2010 12:51 PM E-mail, Ex. D to Nitschke Decl.) By August 19, 2010, Franco Savoni explained that "Elkay will not be taking the Global Tap [sic] cane design unit through our Sales Channels, and your efforts have not been able to meet the projected Sales volumes that the business case was built on . . . We cannot continue to build small quantities of the cane design at the prototype cost structure." (Aug. 19, 2010 E-mail, Ex. D to Nitschke Decl.) Mr. Savoni presented GlobalTap with two options: (1) Elkay could re-brand its own design with the GlobalTap label, or (2) GlobalTap could decide to produce the cane design elsewhere. (*Id.*) Whitman asked Savoni to recommend another manufacturer (Aug. 23, 2010 E-mail, Ex. D to Nitschke Decl.), and although Savoni did not make any recommendations (Aug. 27, 2010 e-mail, Ex. D to Nitschke Decl.), GlobalTap eventually hired

Petersen Manufacturing Company, an Iowa based cement furnishings company, to help manufacture and ship GlobalTap's products. (GlobalTap's Supplemental Ans. to Elkay's First Set of Interrogatories, Ex. H to Nitschke Decl. ¶ 16.)

On January 25, 2013, GlobalTap brought this action alleging (1) patent infringement; (2) trade secret misappropriation, (3) breach of the Confidential Disclosure Agreement, (4) breach of the Sales and Distribution Agreement, (5) fraud, and (6) unfair competition. (GT's Ans. to Elkay's SOF ¶ 9.) On June 27, 2013, this court granted Elkay's motion to dismiss GlobalTap's claims for fraud and unfair competition. (GT's Ans. to Elkay's SOF ¶ 10; June 27, 2013 Minute Order [43].) GlobalTap later stipulated to dismissal with prejudice of its claim for patent infringement, as well. (GT's Ans. to Elkay's SOF ¶ 10.) Three claims remain: Count II for trade secret misappropriation, Count III for breach of the Confidential Disclosure Agreement, and Count IV for breach of the Sales and Distribution Agreement. Fact discovery closed on November 25, 2013. (GT's Ans. to Elkay's SOF ¶ 21.) On March 17, 2014, Elkay moved for summary judgment on the three remaining counts, contending that GlobalTap has failed to present sufficient evidence to support any of its claims. (Elkay Mfg. Company's Mot. for Summ. J. on GlobalTap LLC's Claims [88].)

### DISCUSSION

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Timmons v. Gen. Motors Corp.,* 469 F.3d 1122, 1125 (7th Cir. 2006) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986)). In determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. *Gillis v. Litscher,* 468 F.3d 488, 492 (7th Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)). The moving party has the initial burden to show that the

evidence is insufficient to establish a material element of the non-moving party's case. *Celotex Corp.,* 477 U.S. at 322–23. If the moving party meets this burden, the non-moving party must then "come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). If the evidence supporting the non-moving party's claim is insufficient for a reasonable jury to return a verdict in its favor, the court will grant summary judgment. *Id.*

## I.    Trade Secrets

Plaintiff alleges in Count II that Elkay misappropriated GlobalTap's trade secrets in order to launch its own outdoor bottle-filling station in violation of the Illinois Trade Secret Act ("ITSA"). To state a claim for trade secret misappropriation under ITSA, a plaintiff must demonstrate: (1) a trade secret, (2) that was misappropriated by the defendant, and (3) used by the defendant for business purposes. *Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1265–66 (7th Cir. 1992).

Elkay argues that it is entitled to summary judgment on Count II because GlobalTap has failed to identify its trade secrets with sufficient specificity. GlobalTap has articulated its trade secrets as follows: the "concept of outdoor bottle filling stations," as well as its "Market Opportunity and Business Concept," "Marketing Plan," "Operating Plan," "Financial Projections," and its list of corporate and municipal partners. (GT's SOF ¶ 7.) According to GlobalTap's interrogatory responses, the corporate and municipal partners included "the City of San Francisco, Chicago, IBM, Amway, and Cisco, among others." (*See* GlobalTap, LLC's Supplemental Ans. to Elkay Mfg.'s First Set of Interrogatories, Ex. H to Nitschke Decl., ¶ 4.) The "Market Opportunity and Business Concept," "Marketing Plan," "Operating Plan," and "Financial Projections" together make up a 101-page document called the "Global Tap Business Plan." (*See Id.*; GlobalTap Business Plan, Ex D to Smolczynski Decl.) As this court understands the claims, Global Tap has identified two categories of trade secrets: (1) the information contained within the Business Plan, including GlobalTap's actual and potential

10

corporate and municipal partners, and (2) the concept of an outdoor bottle-filling station. The court addresses each in turn.

## A.  GlobalTap's Business Plan

Elkay urges that it is entitled to summary judgment because GlobalTap has failed, as a matter of law, to identify its trade secrets in sufficient detail.  "The plaintiff must show concrete secrets."  *Composite Marine*, 962 F.2d at 1266. "Hence, [a plaintiff] cannot state a claim for trade secret protection . . . by simply producing long lists of general areas of information which contain unidentified trade secrets."  *Nilssen v. Motorola, Inc.,* 963 F. Supp. 664, 672 (N.D. Ill. 1997) (quoting *AMP Inc. v. Fleischhacker,* 823 F.2d 1199, 1203 (7th Cir. 1987)).  A plaintiff pursuing a trade secret claim "must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition." *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002) (citing *Composite Marine,* 962 F.2d at 1266).  "[T]o sustain a trade secrets claim a party must do more than simply persist in the blunderbuss statement that 'Everything you got from us was a trade secret' . . . That view is wrong as a matter of law."  *Nilssen,* 963 F. Supp. at 672 (internal quotations omitted).

GlobalTap argues that these cases are inapposite because they do not apply "any of the guidelines that Illinois courts look to in determining whether a trade secret exists," which focus on the secrecy of the information.[7]  (GT's Resp. in Opp. to Elkay's Mot. for Summ. J. [96],

---

[7]     GlobalTap also argues that *IDX* and *AMP* are inapplicable because *IDX* applied Wisconsin law and *AMP* was decided prior to the Illinois Trade Secrets Act.  (GT's Resp. at 7–8.)  The Seventh Circuit has confirmed, however, that because "the ITSA mostly codifies rather than modifies the common law doctrine that preceded it . . . *AMP* continues to reflect the proper standard under Illinois's current statutory scheme."  *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995).  Furthermore, while *IDX* is a Wisconsin case, the Seventh Circuit relied on *Composite Marine Propellers*, 962 F.2d 1263 (7th Cir. 1992), a case applying Illinois law, to reach its conclusion.  285 F.3d at 584.  The Court of Appeals understood that Illinois and Wisconsin law impose the same standard for the necessary specificity of trade secrets.  District courts in Illinois have also consistently relied on *IDX* when applying Illinois law due to the similarity between the two states' statutes.  *See Motorola, Inc. v. Lemko Corp.*, 08-cv-5427, 2012 WL 74319, *15, *17 (N.D. Ill. Jan. 10, 2012); *Charles Schwab & Co. v. Carter*, 04-cv-7071, 2005 WL 2369815, *10 (N.D. Ill. Sept. 27, 2005); *Do It Best Corp. v. Passport Software, Inc.*,
(continued . . . )

hereinafter "GT's Resp.," 6.) *See* 765 ILCS 1065/2(d) (a trade secret is "information . . . that is sufficiently secret to derive economic value . . . and is the subject of efforts . . . to maintain its secrecy or confidentiality"); *see also Serv. Centers of Chicago, Inc. v. Minogue*, 180 Ill. App. 3d 447, 453, 535 N.E.2d 1132, 1136 (1st Dist. 1989) ("The focus of both the common law and the Act is on the secrecy of the information sought to be protected"). GlobalTap urges the court to examine the efforts it took to keep its information secret; GlobalTap's brief devotes several pages outlining those efforts. (*See* GT's Resp. at 5–7.) But this approach skips a necessary step. The court cannot analyze whether a piece of information was sufficiently secret to derive economic value or whether GlobalTap took reasonable efforts to keep information secret without first knowing, with particularity, what information comprises the secret. At least one Illinois Appellate Court has explicitly recognized this requirement. *See Geraci v. Amidon*, 2013 IL App (2d) 120023-U, 2014 WL 2329259 (Ill. App. Ct. 2nd Dist. May 28, 2014) ("A plaintiff that does not identify its trade secrets with sufficient specificity risks dismissal of the claim"). Therefore, GlobalTap must identify its trade secrets with sufficient specificity before the court will analyze the secrecy of that information.

Elkay argues that GlobalTap has not met its burden because the Business Plan and other documents are "general areas of information," not concrete or particularized secrets. The list of corporate and municipal partners is insufficiently specific, Elkay continues, because "GlobalTap has not identified what aspect of a mere existence of a relationship with a third party is actually protectable as a trade secret." (Elkay's Mem. of Law in Supp. of its Mot. for Summ. J. [88-4], hereinafter "Elkay's Mem.," 11.) The court agrees. In *IDX*, the Seventh Circuit held that a 43–page description of a software program was insufficient because it included items such as descriptions of the appearances of computer screens that were readily ascertainable and the

_____

01-cv-7674, 2005 WL 743083, *12–*13 (N.D. Ill. Mar. 31, 2005); *Zila Swab Technologies, Inc. v. Van Dyke*, 01-cv-8729, 2002 WL 31028720, *2 (N.D. Ill. Aug. 7, 2002). The court concludes that *IDX* and *AMP* continue to reflect Illinois law.

plaintiff did not specify any line of computer code or an algorithm that might actually be a trade secret. 285 F.3d at 584. With respect to the information in the Business Plan in this case, GlobalTap has done nothing more than point to the entire 101-page document.[8] Even more broadly, Mr. Whitman testified that "every word" in the Business plan is a GlobalTap trade secret. (30(b)(6) Dep. of Mr. Whitman, Ex. C to Smolczynski Decl., hereinafter "30(b)(6) Whitman Dep.," 48:10–13.)

Plaintiff's vagueness is fatal to its claim for trade secret protection of its Business Plan. Plainly, much of the information contained in that Plan is not a GlobalTap trade secret. For example, the Business Plan includes statistics on "global water issues" from the Blue Planet Run Foundation, such as the fact that "unsafe drinking water is the world's leading cause of death" and that "one in six of all humans, lack safe drinking water." (Business Plan at 23.) Another page provides examples of governments around the world that have regulated bottled water. (*Id.* at 25.) Finally, another page includes a cartoon sourced from "cartoonstock.com." (*Id.* at 57.) GlobalTap has merely pointed to the 101-page Business Plan and "invited the court to hunt through the details in search of items meeting the statutory definition." *IDX*, 285 F.3d at 584. There may well be trade secrets within the 101-page Business Plan, but it was Plaintiff's burden to identify those secrets and it has repeatedly failed to do so.

GlobalTap's list of corporate and municipal partners is likewise insufficiently specific.

---

[8]     GlobalTap argues that Interrogatory No. 4, which requests that GlobalTap specifically identify its trade secrets, was "improperly crafted" and is the source of the confusion over the trade secrets. (GT's Resp. at 5.) But this court earlier concluded otherwise, granting, on January 15, 2014, Elkay's motion to compel more specific answers to its interrogatories, including Interrogatory No. 4. (GT's Ans. to Elkay's SOF ¶ 18.) GlobalTap argues that its failure to respond adequately to this motion should be excused because it was unrepresented at the time. (*See* GT's Ans. to Elkay's SOF ¶ 14.) This court denied GlobalTap's motion to vacate the order to compel (Mar. 4, 2014 Minute Entry [85]), however, and even now, with counsel, GlobalTap continues to "stand[] by" its answers to these interrogatories, rather than supplement or clarify them. Nor has GlobalTap provided guidance to the court to enable it to determine which information in the 101-page Business Plan was a trade secret. (*See* GT's Ans. to Elkay's SOF ¶ 20.)

Although customer lists that are not readily ascertainable can be specific enough to quality as trade secrets, *see* 765 ILCS 1065/2(d) ("list[s] of actual or potential customers or suppliers" may be trade secret); *RKI, Inc. v. Grimes,* 177 F.Supp.2d 859, 873 (N.D. Ill. 2001), GlobalTap has not alleged that the "corporate and municipal partners" were customers (actual or potential) and there is evidence that at least some of the listed "partners" were not in fact customers. It appears, for instance, that IBM was a partner in developing the product. (*See* Whitman Discovery Dep. Pt.1 at 45:23–46:7) (relationship with IBM was "to explore the use of IBM technology in GlobalTap units . . . Possibly sensors and maybe filtration.") GlobalTap has not explained what kind of relationship it had with the City of Chicago, Amway, or Cisco, whose names appear on the list, nor has it explained how it could derive economic value from the secrecy of these relationships. The identity of obvious sales targets cannot constitute a trade secret.

Furthermore, even if GlobalTap did establish identifiable trade secrets within the Business Plan or its list of partners, the record is devoid of evidence showing that Elkay ever utilized those trade secrets. To prevail at trial, GlobalTap would need to show that Elkay used its information for its own business purpose. *See Composite Marine Propellers,* 962 F.2d at 1265-66 (third element of a claim for misappropriation of a trade secret is whether it was used by the defendant for business purposes). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, Elkay "need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial." *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2nd Cir. 2001). Instead, Elkay "need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must designate specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Celotex Corp.* 477 U.S. at 324).

Elkay has pointed to the absence of evidence on this element of GlobalTap's claim and

GlobalTap offers no effective evidentiary response. Instead, GlobalTap makes only scattered and general assertions that relate to Elkay's use of the information contained within the Business Plan and its list of partners. First, GlobalTap broadly asserts that "Elkay used the secret information gained from GlobalTap." (GT's SOF ¶ 14.) Portions of the record that GlobalTap cites provide no support for that assertion, however. The cited portion of Mr. Magnuson's deposition refers to Elkay's decision not to provide tooling for the cane design— there is no suggestion that Elkay intended to use that design in its own manufacturing. (*See* Magnuson Dep. at 77:4–79:9.) The deposition of Mr. Whitman that GlobalTap relies on discusses which of GlobalTap's bottle filler designs Elkay was obligated to produce under the SDA. (Whitman Discovery Dep. Pt. 1 at 94:5–98:9.) Finally, GlobalTap cites the entirety of its Amended Complaint, without specifying any particular allegations. (*See* GT's SOF ¶ 14.)

The court's review of the Amended Complaint reveals no allegations that Elkay used the specific information in the Business Plan, relied on any of GlobalTap's financial or marketing models, or consulted GlobalTap's list of "partners." The closest the Amended Complaint comes to such an allegation is the assertion that:

> GlobalTap later learned that Elkay's products -- which it launched after breaking with GlobalTap -- feature a similar height, width, look, and profile as the GlobalTap units. Its actuation button and water spout are in the same position as GlobalTap's product. The two products feature drains that are located at the same height and in the same position. Color selections for Elkay's unit, as well as its paint finish, mirror those for GlobalTap's Outdoor Bottle Filling Station. Last, Elkay offers the very same modular options as the GlobalTap product, including the combination unit. Indeed, Elkay's "Owners Manual" [sic] for the GlobalTap product is identical to its "Owners Manual" for Elkay's competing 4400BF outdoor bottle filling station product.

(Am. Compl. [8] ¶ 28.) The paint finish, concept for the modular or combinations units, and the Owner's Manual do not appear in the Business Plan and were not separately identified by GlobalTap as trade secrets. The only information listed in this paragraph that is contained in the Business Plan is a description of the height, look, and profile of GlobalTap's design, including the position of the spout and drain. (*See* Business Plan at 94–101.) As explained below,

15

however, the general design and profile of GlobalTap's bottle fillers became public knowledge in December 2009 before Elkay launched its own line, and therefore was no longer a trade secret. (*See infra* Section I.B.)  GlobalTap's assertion that Elkay used its general design, therefore, does not create a dispute of a material fact.

GlobalTap's only other assertions that Elkay used its information are supported solely by a citation to the entire Amended Complaint, and therefore do not defeat summary judgment. GlobalTap alleges that "Elkay now uses financial and marketing models it learned from GlobalTap in violation of the Confidential Disclosure Agreement and of the ITSA" (GT's Ans. to Elkay's SOF ¶ 8), that Elkay "use[s] advertising for the fountains, and . . . [has] corporate or governmental sponsors for its sales of other products," (*Id.* at ¶ 24), and finally,

> GlobalTap denies that Elkay never sold [outdoor bottle-filling stations] which are the subject of the Sales and Distribution Agreement between the parties and in fact GlobalTap has alleged that Elkay has designed, manufactured and sold [outdoor bottle-filling stations] in violation of the parties CDA and Sales and Distribution Agreement.

(*Id.* at ¶ 22.)  Without evidentiary support, GlobalTap's denials do not create a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In short, GlobalTap has not presented any evidence, beyond mere allegations, that Elkay used any information within GlobalTap's Business Plan or its list of corporate and municipal partners. Indeed, GlobalTap has presented no evidence regarding Elkay's marketing strategies or pricing; there is no evidence, for example, that Elkay marketed its bottle fillers as a "green" solution, as GlobalTap proposed in its marketing plan.  Nor has GlobalTap presented evidence of Elkay's sales history—for example, the identities of Elkay's customers, evidence of Elkay's sales to any of GlobalTap's purported municipal partners, records showing that Elkay placed outdoor bottle fillers in the locations GlobalTap had identified, nor even a tally of the numbers of units Elkay has sold.  Finally, GlobalTap has not identified whether Elkay developed relationships with any of GlobalTap's purported partners, such as IBM, Amway, or Cisco. GlobalTap has failed to identify "particular parts of materials in the record," FED. R. CIV.

56(c)(1)(A), that show that Elkay used GlobalTap's confidential information.

### B. The concept of an outdoor bottle-filling station

The second trade secret GlobalTap has identified is the "concept of outdoor bottle-filling stations" or its "plan to launch an outdoor water bottle-filling station." This presents a closer question. In *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, the Seventh Circuit found that the "concept for [a] noise-producing toy railroad track" could constitute a trade secret. 342 F.3d 714, 721 (7th Cir. 2003). In *Learning Curve*, the plaintiff had not determined the precise specifications or design of the track, but had simply identified a novel concept. *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 719 (7th Cir. 2003) (defendant's employees recognized "that [plaintiff]'s concept of cutting grooves into the track to produce a clacking sound was a novel concept. Thereafter, [the parties] began to discuss how they could improve the idea to make the train run more smoothly on the track," but decided to focus on obtaining "the contract for the basic product first."). The Seventh Circuit confirmed that the central question was not how precise the concept was, but rather whether the general "concept" was sufficiently secret to derive economic value. *Id.* at 723 ("It was undisputed at trial that no similar track was on the market until" the defendant released its own version.) A general concept, therefore, can constitute a trade secret if it is sufficiently secret and novel.

Moreover, that the "concept of an outdoor bottle-filling station" is a broad concept, or a simple innovation, does not necessarily render it too vague or over-inclusive to be a trade secret; nor does the fact that the patent infringement claim has been dismissed preclude GlobalTap's trade secret claim:

> It goes without saying that the requirements for patent and trade secret protection are not synonymous. Unlike a patentable invention, a trade secret need not be novel or unobvious. The idea need not be complicated; it may be intrinsically simple and nevertheless qualify as a secret, unless it is common knowledge and, therefore, within the public domain.

*Id.* at 724 (internal citation and quotations omitted). Unlike the presentation of its 101-page Business Plan, GlobalTap's concept of an outdoor bottle-filling station is sufficiently specific to

analyze whether it was a trade secret under the ITSA.

Whether that test is met turns on whether the concept was sufficiently secret to derive economic value and whether GlobalTap took reasonable efforts to protect the concept. 765 ILCS 1065/2(d). It is undisputed that in December 2009 GlobalTap launched its first prototype in San Francisco for public use. (GT's Ans. to Elkay's SOF at ¶ 27.) By making the prototype available for public use, the concept of an outdoor bottle-filling station, and GlobalTap's general design, necessarily became public knowledge. The burden therefore shifts to GlobalTap to present specific facts that the concept remained sufficiently secret to derive economic value even after the 2009 launch. GlobalTap has presented no evidence that supports this conclusion. In fact, GlobalTap has emphasized the publicity and interest in bottle-filling stations that the December 2009 launch generated. (*See* Dep. of Whitman at 78:12–14. *See also* Am. Compl. ¶ 14.) Therefore, no reasonable jury could find that the "concept of outdoor bottle-filling stations" was a trade secret after December 2009.

Neither party, however, has presented evidence regarding recognition of the concept of outdoor water bottle-filling stations prior to December 2009. Elkay, as the moving party, bears the initial burden of proof to show that there is no genuine question of material fact. *Celotex Corp.,* 477 U.S. at 322–23. Elkay's Statement of Facts does not meet that burden; it is devoid of evidence regarding the prominence or secrecy of the "concept of outdoor bottle-filling stations" before December 2009. Elkay asserts in its reply brief that the concept is an old one, but does not present any evidence to support that assertion. (Elkay's Reply at 2.) Factual assertions in a reply brief are insufficient to support summary judgment. *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) ("Simply providing additional facts in one's responsive memorandum is insufficient to put those facts before the Court.") Elkay acknowledges this oversight when it states that the court "can take judicial notice that there is nothing protectable in the concept of an outdoor bottle filling station, simply by recalling childhood memories of filling a bottle at a drinking fountain in a park." (Elkay's Reply at 7.) The court's own recollections,

however, do not support Elkay's argument: carrying reusable water bottles was not always as ubiquitous as it is today, and filling bottles from the traditional drinking fountains that Elkay references is often a tricky and cumbersome endeavor. The concept GlobalTap identifies as its trade secret—a fountain specially designed to make filling a bottle easy—differs from traditional drinking fountains and may indeed be a more recent development. The court, therefore, declines this invitation to take judicial notice and instead heeds the Seventh Circuit's warning that

> [t]he existence of a trade secret ordinarily is a question of fact . . . a trade secret is one of the most elusive and difficult concepts in the law to define. In many cases, the existence of a trade secret is not obvious; it requires an ad hoc evaluation of all the surrounding circumstances. For this reason, the question of whether certain information constitutes a trade secret ordinarily is best resolved by a fact finder after full presentation of evidence from each side.

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003) (internal citations and quotations omitted).

There is an open question regarding whether the concept of a water bottle-filling station was a trade secret prior to December 2009. It is undisputed that Elkay completed a line of outdoor bottle-filling stations in 2010 and began selling them in 2011—after the concept had become public. (GT's Ans. to Elkay's SOF ¶ 4.) But the date that Elkay *began* developing its own line of outdoor bottle fillers is crucial. If GlobalTap can show at trial that Elkay began developing its outdoor bottle filler after meeting with GlobalTap in February of 2009, but before the December 2009 public launch, a jury might infer that Elkay was inspired by GlobalTap's concept and used it for its own business purpose. There is at least some evidence in the record to support this inference. For example, Mr. Magnuson, one of Elkay's Product Directors, testified that Mr. Whitman's requests for modular designs "provided an impetus for us [Elkay] to . . . look[] at how can we have a modular design that is much easier to manufacture and bring to market." (Magnuson Dep. at 47:24–48:3.) Viewing the evidence in the light most favorable to GlobalTap, a reasonable jury might find that Elkay used GlobalTap's concept to begin

developing its own line of outdoor bottle-filling stations.

The central question is when Elkay began developing its own line of outdoor bottle-filling stations. Elkay argues there is no genuine dispute of fact because it started developing its outdoor bottle fillers "well in advance of being contacted by GlobalTap in February 2009." (Elkay's SOF ¶ 4.) GlobalTap denies this (GT's Ans. to Elkay's SOF ¶ 4), and Elkay's own materials create questions about when it began developing the outdoor model. Rod Magnuson asserts that Elkay was in significant production of *indoor* bottle-filling stations beginning officially in October 2008, with concepts dating back to the early 2000's, and that the outdoor line of filling stations are "derivatives" of the indoor model. (Decl. of Rod Magnuson [88-2] ¶¶ 2–3.) But Mr. Magnuson testified at his deposition that as of April 2009, Elkay had no plans to launch its own line of outdoor water bottle-filling stations. (Magnuson Dep. at 25:17–20.) Mr. Magnuson instead identified 2010 as the year when the project began. (Magnuson Dep. at 50:15–22.) These inconsistent statements create a genuine dispute regarding (1) whether the concept of an outdoor bottle-filling station was a trade secret prior to December 2009, (2) whether Elkay used that concept to develop its own line of outdoor bottle-filling stations, and (3) when Elkay began developing its own model. These questions of fact defeat Elkay's motion for summary judgment on GlobalTap's trade secret claim with respect to the "concept of an outdoor bottle-filling station."

## II.    Breach of Contract: Confidential Disclosure Agreement ("CDA")

In Count III, Plaintiff alleges that Elkay breached the CDA. GlobalTap maintains that sometime between February 27, 2009, when the CDA was signed, and November 2009, when the Sales and Distribution Agreement was signed, Elkay began planning its own line of outdoor bottle-filling stations. (*See* GT's SOF ¶ 1; GT's Resp. at 11.) The CDA prohibited Elkay from using GlobalTap's information "beyond the PURPOSE [exploring the parties' mutual interest in GlobalTap's bottle-filling project] without first having obtained the written consent of [GlobalTap]." (CDA § 2.4.) GlobalTap appears to argue that Elkay used GlobalTap's

information to develop Elkay's own line of outdoor bottle-filling stations, which was a prohibited use of information under § 2.4. (*See* Am. Compl. ¶¶ 19, 22–24, 28, 36; GT's Resp. at 10–11.) The information protected by the CDA included "business plans and interests related to the PURPOSE; information about or samples of EK or GT's materials; methods; strategies; prototypes; designs; process feasibility issues; market potential information; consumer and supplier data; regulatory and safety strategies; laboratory methods and assays; project approaches and models; technology issues; and clinical data." (CDA at 1.) The CDA exempts information which "is or later becomes, through no act on the part of the RECEIVING PARTY, generally available to the public use." (CDA § 3.2.)

As with the trade secret claim, GlobalTap has presented no evidence to support its allegation that Elkay actually used any of GlobalTap's information contained within the Business Plan or other documents. Elkay broadly asserts that all of GlobalTap's information was in the public domain, and accordingly, not protected by the CDA. (Elkay's Mem. at 14.) Yet the same factual question presented in the trade secret claim presents itself here: whether Elkay utilized GlobalTap's concept of a bottle-filling station between February 27, 2009 (the date the parties signed the CDA) and December 2009 (when GlobalTap's pilot was launched). Again, the timing of Elkay's alleged use of the outdoor bottle filler concept is significant. As explained above, the public launch of the bottle-filling station in December 2009 made the concept of the outdoor bottle filler "public knowledge." GlobalTap cannot, therefore, show a breach after December 2009, when the concept entered the public domain. There remains, however, a question of material fact whether Elkay improperly used GlobalTap's concept before December 2009 to get a head start developing its own line of bottle fillers.

## III.     Breach of Contract: Sales and Distribution Agreement

In Count IV, GlobalTap argues that Elkay breached several provisions of the Sales and Distribution Agreement:

- Sections 1.2 and 2.1 regarding Elkay's obligation to manufacture Elkay's

cane design
- Section 1.3 regarding Elkay's obligation to provide, at Elkay's expense, "tooling" for the production of the design
- Section 7.2 for improper termination of the agreement
- Section 8.1 for Elkay's development of its own product line.[9]

As explained below, the court concludes that genuine disputes of material fact preclude summary judgment on the alleged breaches of Sections 1.2, 2.1, and 7.2. Elkay is entitled to summary judgment on GlobalTap's breach of contract claims with respect to Sections 1.3 and 8.1.

### A.    Sections 1.2 and 2.1: Elkay's obligation to manufacture GlobalTap's Products

GlobalTap alleges that "Elkay breached the [SDA], leaving GlobalTap LLC, without a manufacturer to bring its product to market." (GT's SOF ¶ 6.) Under Section 1.2, Elkay agreed "to manufacture and sell to [GlobalTap] . . . Products for resale to [GlobalTap]'s customers." (SDA § 1.2.) Section 2.1 provided that GlobalTap "shall order such Product as it shall desire from [Elkay] pursuant to such reasonable procedures as [Elkay] shall periodically specify." (SDA § 2.1.) GlobalTap argues that Elkay's refusal to produce either its "cane" design or its proposed wall-mounted and combination units breached the contract. (*See* GT's SOF ¶¶ 5–6.) The court concludes that Elkay was under no obligation to produce the combination or wall-mounted models, but that there remains a question of material fact regarding whether Elkay breached the SDA when it refused to manufacture the cane units.

### 1.    Elkay did not have an obligation to produce the combination or wall-mounted designs

The SDA obligated Elkay to manufacture "Products" for resale to GlobalTap. (SDA § 1.2.) "Products" were defined as "outdoor water bottle filing stations utilizing [GlobalTap]'s Product Design." (SDA at 1.) The Product Design, specified in Exhibit A to the SDA, includes

---

[9]    GlobalTap's Amended Complaint also alleged a breach of Section 7.3, but neither party has discussed this section in their summary judgment filings. Accordingly, the court does not address any alleged breach of Section 7.3.

only the "cane" design, a freestanding base with one long arm to fill bottles; Exhibit A does not show a design that is either wall-mounted or one that includes a combination of the bottle filler and a "bubbler" (a more traditional water-fountain). (Ex. A to SDA.) Elkay was, therefore, under no obligation to produce the wall-mounted or combination units. Its refusal to produce the new models was not a breach of the SDA.

> **2.** **There is a question of material fact regarding Elkay's obligation to manufacture GlobalTap's cane design units**

The SDA did require Elkay to produce GlobalTap's cane design bottle fillers. The court finds disputes of fact that preclude summary judgment on the breach of contract claim related to that requirement. GlobalTap asserts that "Elkay breached the [SDA] leaving GlobalTap without a manufacturer to bring its product to market." (GT's SOF ¶ 6.) GlobalTap has presented evidence that Elkay refused to produce the water bottle-filling stations in the cane design because GlobalTap had not sold enough units: on August 19, 2010, Franco Savoni announced that "Elkay will not be taking the Global Tap [sic] cane design unit through our Sales Channels, and your efforts have not been able to meet the projected Sales volumes that the business case was built on . . . We cannot continue to build small quantities of the cane design at the prototype cost structure." (Aug. 19, 2010 E-mail.) The SDA, however, contains no explicit requirement that GlobalTap order a minimum number of units. A reasonable jury could conclude that Elkay breached its obligation under Sections 1.2 and 2.1 to manufacture the cane design.

Elkay responds that because it was entitled under Section 2.1 to establish "reasonable procedures" for ordering the outdoor water bottle-filling stations, it could impose minimum order requirements. (*See* Elkay's Mem. at 14–15.) Section 2.1 does permit Elkay to establish procedures for ordering, but it does not mention a minimum quantity requirement, and other language in the SDA defeats the inference that the "reasonable procedures" language can be interpreted as imposing such a requirement. Thus, Section 2.1 simply states that GlobalTap "shall order such Product as it shall desire" pursuant to the procedures established by Elkay.

The contract even explicitly contemplates small orders in its schedule for production lead times: GlobalTap was instructed to provide two to four weeks of lead time for orders of one to nine units, implying that small orders—even of one unit—were permitted. Granting all inferences in GlobalTap's favor, there is an open question whether Elkay's refusal to produce the GlobalTap's cane design because of the small number of units ordered was a "reasonable procedure" contemplated in Section 2.1 or a breach of its obligation to manufacture the cane design.

**B.    Section 1.3: Tooling**

The parties agree that Elkay did not provide tooling. (Def.'s Resp. to GT's Local R. 56.1(b)(3)(C) Statement of Additional Facts [100-2], hereinafter "Elkay's Resp. to GT's SOF," ¶ 19.) GlobalTap asserts that Elkay's failure to do so breached Section 1.3 of the SDA, which provides that Elkay "will be responsible for obtaining, at its sole cost and expense, all tooling necessary for the manufacture of the Product." (SDA § 1.3.) Elkay argues that Section 1.3 only obligated Elkay to provide tooling "necessary for the manufacture of the product." (SDA § 1.3; Elkay's Reply at 10.) This provision, Elkay continues, obligated it to pay for tooling in the event that tooling was necessary to manufacture the fountains, but did not create a separately enforceable obligation. (Elkay's Reply at 10.) The court agrees with Elkay's interpretation. Section 1.3 obligated Elkay to pay for tooling in the event that Elkay chose to use this method to manufacture the cane design. As Mr. Magnuson clarified, Elkay could "build units without tooling, it just costs more." (Apr. 27, 2010 12:51 E-mail.) Elkay had, in fact, already produced small quantities of the cane design as prototypes, but found this procedure costly. (*See* Aug. 19, 2010 E-mail) ("We cannot continue to build small quantities of the cane design at the prototype cost structure.") Elkay was obligated to manufacture the cane design under Section 1.2 of the agreement, and could either manufacture the designs with or without tooling, if this was possible. Section 1.3 provided for the contingency that, if Elkay decided to set up tooling, it would bear the cost. Elkay did not breach the agreement by electing not to use a particular manufacturing process.

### C.    Section 7.2: Improper Termination of the Agreement

Next, GlobalTap alleges that Elkay violated the agreement by failing to comply with the required procedures for terminating the agreement.  (*See* Am. Compl. ¶ 38(b).)  Under Section 7.2, any party seeking to terminate the agreement could provide "written notice to the other party" in the event that the other party failed or neglected "to perform covenants or provisions of the Agreement" and terminate the agreement if "such default is not corrected within thirty (30) days after receiving written notice from the other party."  (SDA § 7.2.)  Elkay alleged that the parties mutually terminated the agreement in August of 2010 and therefore it is entitled to summary judgment on this issue.  (Elkay's SOF ¶ 23.)  GlobalTap, however, presented evidence that on August 10, 2010, Elkay refused to manufacture the various designs of the outdoor water bottle fillers and stated further that if GlobalTap chose to use another manufacturer "we will consider the [SDA] as terminated."  (Aug. 10 Mem. at 1.)  There are disputes of fact concerning whether the termination was mutual or unilateral and whether Elkay's written notice on August 10, 2010 complied with the requirements of section 7.2.  Accordingly, the court denies Elkay's motion for summary judgment with respect to GlobalTap's claim for breach of Section 7.2 of the SDA.

### D.    Section 8.1: Right of First Refusal

Finally, GlobalTap alleges that Elkay violated Section 8.1 of the SDA when it failed to inform GlobalTap that it was independently attempting to design its own outdoor bottle-filling stations.  (*See* GT's Resp. at 12.)  But GlobalTap misreads the terms of the contract.  Section 8.1 provides:

> The parties contemplate that Distributor [GlobalTap] will work with Supplier [Elkay] with respect to the engineering and manufacture of new outdoor water bottle filling station products contemplated by Distributor and based on the Products.  In advance of beginning collaborative work on any new products, the parties shall mutually agree on ownership of the intellectual property associated with the new product.  In addition during the Term of this Agreement, and for a two year period after termination or expiration, Supplier shall have the right of first refusal to manufacture any outdoor water bottle filling station product developed by Distributor either alone, with Supplier or with a third party (parties)

on substantially the same terms and conditions as offered by a third party manufacturer.

(SDA § 8.1.)  This provision imposed no obligation on Elkay to inform GlobalTap that Elkay was beginning to develop its own line of outdoor bottle-filling stations.  The parties were obligated to agree on ownership of the intellectual property only if they began "collaborative work" on any new projects.  (*Id.*)  Unilateral projects by Elkay are not covered by the terms of Section 8.1 and are even explicitly acknowledged in Section 1.2.  (*See* SDA § 1.2) ("[GlobalTap] acknowledges that [Elkay] is in the business of the development, design, manufacture, distribution and sale of . . . outdoor fountains and bottle filling products and nothing herein shall preclude [Elkay] from developing, designing, manufacturing, distributing or selling any products, except as expressly set forth herein").  Furthermore, GlobalTap did not have a right of first refusal.  Section 8.1 provides the right of first refusal only to the "Supplier," and "Supplier" is defined as "Elkay Manufacturing Company."  (SDA at 1.)  Elkay, therefore, had no obligation to inform GlobalTap that it was developing its own product, and indeed GlobalTap was on notice that Elkay was developing its own product given the language in Section 1.2.  Elkay is, accordingly, entitled to judgment as a matter of law with respect to GlobalTap's claim that Elkay breached Section 8.1 of the contract.

### E.    Damages

Elkay argues it is entitled to summary judgment on GlobalTap's breach of contract claims because GlobalTap has "not identified any actual damages," which are an essential element of a contract claim.  (Elkay's Mem. at 15) (citing *Association Ben. Services, Inc., v. Caremark RX, Inc.,* 493 F.3d 841, 849 (7th Cir. 2007)).  Elkay, as the moving party, however, bears the initial burden of establishing that there is no genuine issue of fact.  GlobalTap has presented some evidence that, as a result of the alleged breaches, Elkay was able to enter the market first and that being first to market the outdoor bottle-filling stations was valuable.  (*See* GT's SOF ¶ 11; Magnuson Dep. at 37:11–15.)  Furthermore, GlobalTap has stated that it plans

to rely on expert testimony to prove its damages. (*See* GT's Ans. to Elkay's SOF ¶ 20.) Admittedly, there is little information in the record at this stage that speaks to GlobalTap's actual damages, but because the court cannot conclusively determine on the current record that GlobalTap is not entitled to damages, a grant of summary judgment on this issue would be premature.

## **CONCLUSION**

For these reasons, Elkay's motion for summary judgment [88] is granted in part and denied in part. The motion is granted with respect to GlobalTap's claims for misappropriation of trade secrets contained with the Business Plan and for breach of contract claims pertaining to Sections 1.3 and 8.1 of the Sales and Distribution Agreement. But on GlobalTap's claim for misappropriation of trade secrets with respect to the "concept of an outdoor water bottle filler," and on its claims for breach of the Confidential Disclosure Agreement, and Sections 1.2, 2.1, and 7.2 of the Sales and Distribution Agreement, summary judgment is denied.

ENTER:

Dated:        January 5, 2015

_____
REBECCA R. PALLMEYER
United States District Judge